# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

BETTY FRANKLIN,

     Plaintiff,

v.                                          CIV 12-1167 KBM/CG

THE UNITED STATES OF AMERICA,

     Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on three dispositive motions:  1) Plaintiff's Motion for Sanctions, Disqualification, and Exclusion of Witness (*Doc. 90*) ("Motion for Sanctions"), filed November 20, 2013; 2) the United States' Motion to Dismiss Plaintiff's Claims Not Raised in her Tort Claims Notice for Lack of Jurisdiction *(Doc. 83)* ("Motion to Dismiss"), filed November 5, 2013; and 3) the United States' Motion in Limine to Exclude Expert Opinions that Were Not Timely Disclosed or are Otherwise Inadmissible at Trial *(Doc. 84)* ("Motion in Limine"), filed November 5, 2013.   Additionally, the Court addresses herein Plaintiff's Appeal of Magistrate's Order Striking Plaintiff's Expert Witness Rebuttal Reports (*Doc. 125*) ("Rule 72 Objections"), filed January 2, 2014.

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties consent to have me serve as the presiding judge and enter final judgment.  *Docs. 8, 12, 13.*  Having reviewed the parties' submissions and the relevant law, and having heard argument of counsel at the February 11, 2014 motions hearing, the

Court will deny the Motion for Sanctions, will grant in part and deny in part the Motion to Dismiss and the Motion in Limine, and will overrule the Rule 72 Objections. The Court will dismiss Plaintiff's informed consent claim and her claim based upon Dr. Wilder's alleged negligence in the performance of the September 28, 2010 cold knife cone procedure. Additionally, it will limit Dr. Steiner's expert testimony to the area of urology and will exclude his testimony regarding the possibility of future dialysis treatments.

## I.    BACKGROUND

Plaintiff Betty Franklin is a member of the Navajo Nation. *Doc. 1* at ¶ 7. On August 19, 2010, she underwent a well-woman examination at the Northern Navajo Medical Center ("NNMC"), which is a medical facility in Shiprock, New Mexico that provides medical care to Native Americans pursuant to various federal statutes. *Id.* at ¶ 4. At the well-woman examination, Plaintiff reported vaginal bleeding for approximately two months, despite being post-menopausal. *Id.* at ¶ 9.

Thereafter, Dr. Kathleen Wilder, an employee of Indian Health Services, performed various procedures on Plaintiff in August and September of 2010, and Plaintiff was ultimately diagnosed with squamous epithelium most consistent with squamous cell carcinoma in situ. *Id.* at ¶ 10-13, 34. Dr. Wilder recommended that Plaintiff undergo a total abdominal hysterectomy ("TAH") and bilateral salpingo-oophorectomy ("BSO"). *Id.* at ¶ 14. Dr. Wilder performed Plaintiff's TAH/BSO procedure on October 14, 2010. *Id.* Five days later, Plaintiff had her first post-operative visit with Dr. Wilder at which time she had staples removed

and reported post-op pain. *Id.* at ¶ 16. Plaintiff was instructed to return in approximately one month. *Id.*

On October 21, 2010, Plaintiff was treated at the Gallup Indian Medical Center ("GIMC") for a urinary tract infection after she complained of left lower back pain. *Id.* at ¶ 18. The next day, on October 22, 2010, Dr. Wilder's office contacted Plaintiff, asking her to come to the clinic to see Dr. Wilder as soon as possible; she was scheduled for a return visit on October 25, 2010. *Id.* at ¶ 17.

At the October 25, 2010 appointment, Dr. Wilder informed Plaintiff that she had invasive cervical cancer. *Id.* Plaintiff reported to Dr. Wilder that she had experienced left lower back pain for approximately one week. *Id.* at ¶ 19. A CT scan of Plaintiff's abdomen that same day indicated, among other findings, a "moderate left hydronephrosis and hydroureter with associated perinephric stranding and enlargement of the left kidney." *Id.* at ¶ 22. The next day, Plaintiff was admitted to the University of New Mexico Hospital ("UNMH") in part for evaluation and treatment of her left-sided hydronephrosis. *Id.* at ¶ 24.

On October 29, 2010, it was confirmed that Plaintiff had suffered ligation of the left ureter during the hysterectomy performed by Dr. Wilder. *Id.* at ¶ 27. Plaintiff was discharged from UNMH on November 1, 2010, with a nephrostomy tube and urine bag. *Id.* at ¶ 29. Then, in July 2011, Plaintiff's left kidney became necrotic due to chronic inflammation, and it was removed on July 20, 2011. *Id.* at ¶ 31.

In her Complaint pursuant to the Federal Tort Claims Act (FTCA), Plaintiff alleges a singular count of negligence against the United States. *See id.* at 5-8.

She claims that the United States' employee, Dr. Wilder, breached her duty of care to Plaintiff by "failing to measure up to the standards of reasonable care, skill, and practice required of members of their profession." *Id.* at ¶ 38.  More specifically, Plaintiff claims that Dr. Wilder ligated and damaged her left ureter during the hysterectomy that she performed on October 14, 2010, and that she failed, during surgery and in the days following, to identify and repair the ligated left ureter. *Id.* at 6.

## II.   LEGAL STANDARDS

### A.  Sanctions

Federal courts have the inherent power to manage their own proceedings and control the conduct of those who appear before them.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-51 (1991).  Appellate courts review a court's imposition of sanctions under its inherent power for an abuse of discretion.  *Id.* at 55.

### B.  Exhaustion

The Federal Tort Claims Act ("FTCA") provides that "an action shall not be instituted upon a claim against the United States for money damages" unless the claimant first exhausts his or her administrative remedies.  28 U.S.C. § 2875(a).

### C.  Rule 72 Objections

Under Rule 72(a) of the Federal Rules of Civil Procedure, the Court shall consider objections made by the parties and "shall modify or set aside any portion of the magistrate's order found to be clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). To overturn the magistrate judge's decision as clearly erroneous under Rule 72(a), the district

court must have "a definite and firm conviction that a mistake has been committed." *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir.1988) (internal quotation omitted). Put another way, "[t]o be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228, 233 (7th Cir. 1988).

### D.  Rule 702 and *Daubert*

Federal Rule of Evidence 702 lays the foundation for the admissibility of expert testimony, providing as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  To determine whether an expert opinion is admissible under Rule 702, a court must perform the following two-step analysis:

1. The court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion, and

2. If the expert is so qualified, the court must determine whether the expert's opinion is reliable and helpful under the principles set forth in *Daubert*.

*See 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).

### III.   ANALYSIS

### A.  Motion for Sanctions

Plaintiff argues that the conduct of counsel for the United States, Ruth Keegan, in initiating an *ex parte* contact with Plaintiff's treating physician, Dr. Teresa Rutledge, warrants sanctions.  *Doc. 90* at 1.  Although counsel for Plaintiff conceded at the February 11, 2014 motions hearing that judgment on liability would be an "extreme" measure, he maintains that both disqualification of counsel and exclusion of Dr. Rutledge's testimony are appropriate.

On November 6, 2013, after the discovery deadline, Ms. Keegan served a supplemental disclosure naming Dr. Rutledge as a witness for the United States.[1]  *Doc. 86*.  In response to an inquiry by Plaintiff's counsel, Ms. Keegan explained that she had communicated with Dr. Rutledge by e-mail and orally and that she had provided some of Plaintiff's medical records to Dr. Rutledge.

Dr. Rutledge, who has now been Plaintiff's treating doctor for cervical cancer for approximately three years, was not treating Plaintiff at the time of her October 14, 2010 hysterectomy.  Instead, Dr. Wilder provided Plaintiff's pre-surgical care and performed the hysterectomy.  Both parties agree that Dr. Rutledge became a potential fact witness in this case, however, when Dr. Wilder consulted her just before Plaintiff's hysterectomy.  Indeed, Plaintiff's October 8, 2010 medical records include the following note by Dr. Wilder:  "Called Dr. Rutledge, gyn onc at UNM.  She says TAH/BSO is reasonable.  If I open and she

---

[1] The Court's understands Dr. Rutledge to be strictly a fact witness concerning the conversation that she had with Dr. Wilder before Plaintiff's hysterectomy.  Plaintiff has expressed concern that "the defense is also trying to make Dr. Rutledge an expert witness in plain violation of Rule 26(a)(2)(B), Fed. R. Civ. P., and the case deadlines in this matter, by using Dr. Rutledge as a witness as to the standard of care."  *Doc. 121* at 2.  Because the United States did not designate Dr. Rutledge as an expert witness, she will not be permitted to offer expert opinions in this case.

has obvious cancer in her parametrium or elsewhere, then will need radiation, and would like to proceed here." *Doc. 101*, Ex. A at 1-2.  Dr. Rutledge did not undertake the care of Plaintiff until several weeks or eighteen days[2] after this documented communication between Dr. Wilder and Dr. Rutledge.  *Doc. 101* at 5.

Plaintiff's expert, Dr. Robert Barry Domush, opined during his September 10, 2013 deposition that Dr. Wilder's consultation with Dr. Rutledge before Plaintiff's hysterectomy did not change his opinion that Dr. Wilder should have referred Plaintiff to UNMH.  *Doc. 101*, Ex. B, at 76:7-78:8.   According to Dr. Domush, it was not clear that Dr. Wilder informed Dr. Rutledge of the pathologist's comment regarding "possible invasion."  *Id.* at 76:13-14.  In fact, he testified that he could not believe that Dr. Rutledge "if she was presented correctly with all the facts, would not have taken the patient." *Id.* at 77:14-16.

Ms. Keegan represents that two weeks after Dr. Domush's deposition she informed Plaintiff's counsel that she needed to depose Dr. Rutledge because of Dr. Domush's testimony that he did not believe Dr. Wilder gave Dr. Rutledge all relevant information.  *Doc. 101* at 3.  Plaintiff's counsel agreed.  *Id.*

On September 24, 2013, Ms. Keegan spoke with Dr. Rutledge, informing her that the United States wanted to depose her in this case and providing her with Plaintiff's medical records, which she expected to discuss during the deposition.  *Doc. 101* at 3.  The United States was not able to notice Dr.

---

[2] The United States claims that it was "several weeks" after the conversation between Dr. Wilder and Dr. Rutledge that Plaintiff became a patient of Dr. Rutledge.  *Doc. 101* at 5.  Plaintiff, however, claims that it was eighteen days.  *Doc. 121* at 1.  Neither party submits evidence to establish the precise timing.

Rutledge's deposition before the Government's budgetary shutdown on October 1, 2013, in part due to the unavailability of Plaintiff's counsel.  *Id.* at 3-4.

When the government reopened on October 17, 2013, the United States again requested dates from Dr. Rutledge for her deposition.  *Id.* at 4.  Plaintiff's counsel did not respond with his availability until October 23, 2013, when he refused to provide dates, maintaining that the United States could not serve the notice within the discovery deadline.  *Id.*  The United States indicates that "[i]n an effort to avoid another dispute with Plaintiff's counsel, AUSA Keegan decided it would be simpler just to call Dr. Rutledge to testify at trial."  *Id.* at 5.

Plaintiff contends that it was improper for Ms. Keegan to speak with Dr. Rutledge, Plaintiff's treating physician, without Plaintiff's consent and to send a portion of Plaintiff's medical records to Dr. Rutledge "for the obvious purpose of influencing the doctor's opinion and possible testimony."  *Doc. 90* at 3.  Plaintiff emphasizes that Ms. Keegan did not seek approval from the Court before engaging in *ex parte* communications with Plaintiff's treating physician.  *Id.* at 6-7.

As a preliminary matter, it is apparent to the Court that counsel for both parties have engaged in an unfortunate game of "hardball" throughout the discovery process in this case.  Plaintiff's counsel made it nearly impossible for the United States to notice the deposition of Dr. Rutledge, but only after counsel for the United States exhibited inflexibility and overly-rigid application of the procedural rules in discovery.  *See Doc. 91*, Ex. 2 (United States objecting to discovery served one day late); *see also Doc. 91* (Plaintiff's Motion to Strike the

United States' expert, where the United States served the signed expert report one day after the deadline).  The Court cautions counsel to refrain from such obstructive and unproductive behavior.

Ultimately, the difficulty that Ms. Keegan experienced in noticing the deposition of Dr. Rutledge led her to forgo the deposition altogether and to instead designate Dr. Rutledge as a witness at trial, albeit after the discovery deadline.  It is not clear that Ms. Keegan's course was wholly unreasonable in light of the difficultly that she encountered from Plaintiff's counsel and because of the Government shutdown.  The more critical question for purposes of the Motion for Sanctions, though, is whether Ms. Keegan's *ex parte* contact with Dr. Rutledge and provision of Plaintiff's medical records, violated any privilege, federal rule, or the Health Insurance Portability and Accountability Act ("HIPAA") and, if so, whether any of the proposed sanctions are appropriate.

### i.  Physician-Patient Privilege

The parties agree that federal common law, not state privilege law, applies in this FTCA case.  *See Vondrak v. City of Las Cruces*, 760 F. Supp. 2d 1170, 1175 (D.N.M. 2009) (J. Browning).  Notably, there is no physician-patient privilege under federal common law.  *Hancock v. Dodson*, 958 F. 2d 1367, 1373 (6th Cir. 1992).  Moreover, even if there were an applicable physician-patient privilege, Plaintiff arguably waived it, at least with respect to Dr. Wilder's medical records, when she filed suit and produced her records to the United States.

### ii.  Public Policy

Plaintiff argues that, even in the absence of a physician-patient privilege, public policy prohibits *ex parte* contacts between defense counsel and a plaintiff's treating physician, citing *Smith v. Ashby*, 743 P.3d 114 (N.M. 1987) (reasoning that an *ex parte* conference between a party's physician and her legal adversary run contrary to the interests of society and are prohibited), *Church's Fried Chicken No. 1040 v. Hanson*, 845 P.2d 824 (N.M. Ct. App. 1992) (holding that a district court did not error in issuing an order prohibiting an employer/insurer from engaging in *ex parte* contacts with a treating healthcare provider), and *Mosley v. Titus*, 762 F. Supp. 2d 1298, 1317-19 (D.N.M. 2010) (J. Browning) (holding that the defendant had a basis under New Mexico law for filing suit against a medical doctor who had engaged in *ex parte* communications about his patients with third parties).[3]

The United States, on the other hand, maintains that there is no *per se* rule or ethical prohibition against an attorney contacting a witness to determine how she may testify. *Doc. 101* at 6. The United States contends that Dr. Rutledge is a witness in this action independent of her physician-patient relationship with Plaintiff and that it was proper for Ms. Keegan to contact her for the sole purpose of ascertaining her memory of her October 8, 2010 conversation with Dr. Wilder. *Id.*

The United States' position finds some support in case law. First, in *MacDonald v. United States*, 767 F. Supp. 1295 (M.D. Pa. 1991), the court

---

[3] Plaintiff also cites *Bodenner v. Martin*, 12cv0601 MV/SMV (D.N.M. June 10, 2013) (J. Vazquez). However, contrary to Plaintiff's position, Judge Vazquez did not address whether there was a prohibition under New Mexico law of disclosure of patient information outside the presence of the patient's attorneys; instead, she merely recounted the plaintiff's argument to that effect. *Id.*

declined to sanction an Assistant United States Attorney for contacting the plaintiff's physician in an FTCA medical malpractice case. *Id.* at 1300. The court also denied the plaintiff's motion to strike the treating physician as an expert for the Government, reasoning that the Federal Rules of Evidence applied and the minimal contact between defense counsel and the plaintiff's physician did not justify the imposition of such a sanction. *Id.*

Second, in *In re American Medical Systems, Inc. Pelvic Repair Systems Product Liability Litigation*, 946 F. Supp. 2d 512 (S.D.W. Va. 2013), one of the plaintiff's doctors had a long-standing consulting relationship with the defendant. *Id.* In rejecting the plaintiff's position that the defendant should not be permitted to meet with the doctor *ex parte*, the court noted that the subject matter of the *ex parte* communication would not involve the medical condition or treatment of the plaintiff. *Id.* at 515. The court also noted that the doctor had two different roles and held that "no federal rule, physician-patient privilege, privacy regulation, or public policy prevent[ed] [the defendant] from meeting with [the plaintiff's doctor] to discuss his contacts with and activities on behalf of [the defendant]." *Id.*; *see also Williams v. Rene*, 72 F.3d 1096 (3d Cir. 1995) (expressing reservations about requiring advance notice to the plaintiff before an *ex parte* contact by defense counsel with the plaintiff's physician, because such a requirement would "hinder[] settlement negotiations and trial preparation" because it would require "more expensive and time-consuming procedures of a formal deposition" and favoring the "time-honored" approach of allowing parties to interview witnesses in private without consent of opposing counsel and without requiring transcripts).

Under the circumstances here, the Court finds that Ms. Keegan's *ex parte* contact with Dr. Rutledge was both minimal and distinguishable from the contacts prohibited by the New Mexico Supreme Court in *Ashby*.  Significantly, the subject matter of the conversation between Dr. Rutledge and Ms. Keegan did not directly involve Plaintiff's medical condition or her treatment by Dr. Rutledge, but instead concerned a conversation that Dr. Rutledge had with Dr. Wilder *before* Dr. Rutledge took on Plaintiff's care.  Ms. Keegan assures the Court that she did not inquire into, nor did Dr. Rutledge offer, confidential communications between Dr. Rutledge and Plaintiff, and she suggests that Dr. Rutledge's care of Plaintiff is not relevant to the subject suit.  *Id.* at 5.

Moreover, as in *In re American Medical Systems, Inc.*, Dr. Rutledge has two distinct roles here:  as a fact witness concerning her October 2010 conversation with Dr. Wilder and as Plaintiff's current treating physician.  The Court cannot find that Ms. Keegan, in contacting Dr. Rutledge in her role as a fact witness, violated a federal rule, privilege, or public policy.  Accordingly, the rationale underlying the New Mexico Supreme Court's prohibition of *ex parte* communications with an opposing party's physician is not applicable here, and Plaintiff has not otherwise established any violation of public policy.

### iii.  HIPAA

Plaintiff argues that Ms. Keegan's actions violated HIPAA, as neither she nor Dr. Rutledge followed the specific procedures set out in the regulations promulgated pursuant to HIPAA.  *Doc. 90* at 10.  Plaintiff contends that 45 C.F.R. § 164.512(e), which permits disclosures of protected health information in judicial

proceedings, applies to Ms. Keegan's contact with Dr. Rutledge and required Ms. Keegan to give notice to Plaintiff or to make reasonable efforts to secure a qualified protective order. *Doc. 121* at 9-10. Additionally, Plaintiff argues that Ms. Keegan had an obligation under HIPAA regulations to safeguard the privacy of protected health information as a "business associate" who provided legal services to her client, Indian Health Services, a covered entity. *Doc. 121* at 10 (discussing 45 C.F.R. § 160.102(b) and § 160.103).

The Court remains unconvinced that Ms. Keegan violated the dictates of HIPAA, either by providing Dr. Rutledge with Plaintiff's medical records or by engaging in an *ex parte* conversation with her. First, Plaintiff has not established that Dr. Rutledge, as Plaintiff's treating gynecologist oncologist, had not already reviewed the records supplied by Ms. Keegan. Plaintiff's counsel admitted at the motions hearing that he did not know whether she had done so. If Dr. Rutledge had previously reviewed the records, any purported HIPAA violation by Ms. Keegan in providing those records would no doubt be harmless. Furthermore, as the United States argued persuasively at the motions hearing, the privacy concerns upon which HIPAA is based are not triggered by the provision of medical records to a person's own treating physician; for if anyone should be permitted access to a person's medical records, it would surely be her treating physician.

Additionally, Plaintiff has not established that any information disclosed during the course of the conversation between Dr. Rutledge and Ms. Keegan qualified as "protected health information" under HIPAA. Rather, the subject of

the conversation was restricted to a prior consultation between Dr. Rutledge and

Dr. Wilder, which occurred at a time when no physician-patient relationship

existed between Plaintiff and Dr. Rutledge.  Plaintiff has presented no authority to

establish that such a conversation is a clear violation of HIPAA.  *But see Thomas*

*v. 1156729 Ontario, Inc.*, No. 13-12283, 2013 WL 5785853 (E.D. Mich. Oct. 28,

2013) ("HIPAA neither prohibits or permits defendants to conduct *ex parte*

interviews with physicians.") (citing *Bayne v. Provost*, 359 F. Supp. 2d 234, 240

(N.D.N.Y. 2005).

### iv. Improper Influence over Witness

Plaintiff posits that Dr. Rutledge's trial testimony has been tainted by her

*ex parte* discussion with defense counsel.  *Doc. 90* at 10.  The Court notes,

however, that issues of improper influence and witness tainting are not unique to

the circumstances here but exist anytime there are *ex parte* interviews of

witnesses.  Yet "no party to litigation has anything resembling a proprietary right

to any witness's evidence" and the Federal Rules "have never been thought to

preclude the use of such venerable, if informal, discovery techniques as the *ex*

*parte* interview of a witness who is willing to speak."  *Doe v. Eli Lilly & Co., Inc.*,

99 F.R.D. 126, 128 (D.D.C. 1983).  Plaintiff's contention that Dr. Rutledge cannot

now retain an untainted recollection of a single, brief telephone conversation with

Dr. Wilder more than three years ago is one well-suited for cross examination.

In sum, where Ms. Keegan's *ex parte* contact with Dr. Rutledge did not

involve Plaintiff's medical condition or her medical treatment by Dr. Rutledge, but

instead concerned a conversation that Dr. Rutledge had with Dr. Wilder before

Dr. Rutledge took on Plaintiff's care, the Court can find no violation of a privilege, public policy, federal rule, or HIPAA. Accordingly, the Court will deny Plaintiff's Motion for Sanctions.

### B. Motion to Dismiss

#### i. Negligence of Dr. Wilder

Exhaustion of administrative claims under the FTCA is jurisdictional. *See Estate of Trentadue v. United States*, 397 F.3d 840, 852 (10th Cir. 2005). Under the FTCA, "an action shall not be instituted upon a claim against the United States for money damages" unless the claimant first exhausts his or her administrative remedies. 28 U.S.C. §2875(a). Section 2401(b) provides that tort claims are forever barred unless the administrative claim is presented to the agency within two years after such claim accrues. 28 U.S.C. § 2401(b).

The provisions of the FTCA are strictly construed, as the Act constitutes a limited waiver of sovereign immunity. *Estate of Trentadue*, 397 F.3d at 852. "The jurisdictional statute, 28 U.S.C. § 2675(a), requires that claims for damages against the government be presented to the appropriate federal agency by filing (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim." *Id.* (internal quotations omitted).

The United States argues that any negligence claims based upon conduct that occurred *before* Plaintiff's October 14, 2010 surgery are unexhausted and must be dismissed for lack of subject matter jurisdiction. *Doc. 83* at 6-7. The United States defines the scope of Plaintiff's exhausted claims as "the treatment

provided to Plaintiff at NNMC from October 14, 2010 to October 28, 2010" and the purported negligence in failing "to realize and correct that Dr. Wilder had cut, and subsequently blocked, the left ureter, with a stitch related to the hysterectomy procedure." *Id*. at 6.   Additionally, the United States contends that Plaintiff failed to meet the jurisdictional prerequisites for negligence claims arising from care provided at GIMC.  *Id*. at 7.

Plaintiff filed her Notice of Claim with the Department of Health and Human Services on January 12, 2012.  *Doc. 83*, Ex. A.   The Department denied Plaintiff's claim and this suit, filed November 13, 2012, followed.  *See Doc. 1.* For the most part, the allegations in Plaintiff's Complaint track the information provided in the Notice of Claim.  *Compare Doc. 1 with Doc. 83*, Ex. A.  Plaintiff does, however, provide additional detail concerning her pre-surgery care within her Complaint, omitting such information from her Notice of Claim.  Yet Plaintiff's Complaint does not go so far as to explicitly allege any particular negligent conduct by Dr. Wilder prior to Plaintiff's October 14, 2010 surgery.  According to her Complaint, Plaintiff alleges that Dr. Wilder was negligent in the following ways:

> "a) during total abdominal hysterectomy and bilateral salpingo-oophorectomy surgery, ligating and damaging the left ureter; b) failing during surgery and post-op, and in the days subsequent to the surgery, to identify and repair the ligated left ureter; c) negligently and carelessly failing to measure up to the requisite standards of care and skill required and observed in the field of medicine while performing surgery, and in further particulars at this time unknown to plaintiff as to the specific facts, but which are verily believed and hereby alleged will be disclosed during discovery in the course of the litigation."

*Doc. 1* at ¶ 38.

Although the allegations in Plaintiff's Complaint are limited to Plaintiff's October 14, 2010 surgery and post-surgical treatment, Plaintiff's expert, Dr. Domush, offered opinions in his expert report that Dr. Wilder was negligent in various ways before Plaintiff's surgery, including 1) by failing to explain her experience level in the type of procedures that Plaintiff would undergo; and 2) by not obtaining appropriate cervical biopsy tissue at the time of the cold knife cone procedure and failing to abort that procedure and refer Plaintiff to UNMH. *Doc. 83,* Ex. B.  In her response brief, Plaintiff also outlines additional "instances of negligence closely related to the surgery," which she asserts became known as a result of the expert report of Dr. Domush, including Dr. Wilder's failure to understand that the pre-surgical diagnostic tests strongly indicated invasive cancer and her failure to recognize that she was not sufficiently experienced to competently perform surgery on Plaintiff. *Doc. 105* at 14.

Plaintiff's Complaint, however, omits any theories of liability premised upon Dr. Wilder's pre-October 14, 2010 acts and omissions, and, to date, Plaintiff has not moved to amend her complaint.  As a result, Defendant's Motion to Dismiss could be construed as premature and/or hypothetical.  Nevertheless, Plaintiff does not concede the absence of pre-surgical negligence claims in her Complaint but, instead, resists "Defendant's effort to excise from [her] claims of negligence the surgeon's pre-operative work-up."  *Id.* at 4-5.  Furthermore, the Court considers it more efficient to address the exhaustion of pre-October 14, 2010 negligence claims now, rather than in opposition to an opposed motion to amend in the future.

Plaintiff contends that by referring to her pre-surgical cancer diagnosis in her Notice of Claim, she provided adequate notice of "pre-surgery claims involving Dr. Wilder's negligent cancer-related omissions during Plaintiff's pre-operative diagnosis and work-up." *Id.* at 2.   In so arguing, Plaintiff relies principally, upon a single sentence in the "Basis for Claim" portion of her Notice of Claim, which provides:   "Just prior to October 14, 2010, [Plaintiff] was diagnosed with invasive cancer." *Id.* at 3.   Plaintiff reasons that this statement indicates that her cancer was the "stated backdrop" for her negligence claims and that the provided description of her injury enabled the agency to investigate her pre-surgical medical visits with Dr. Wilder, which primarily occurred two to three weeks before her surgery. *Id.* at 4.   Yet Plaintiff admits that she did not know until her attorney engaged an expert that Dr. Wilder's negligence could include her alleged failure to understand that the pre-operative tests showed significant pathology and that, given her lack of experience, she should not have undertaken Plaintiff's surgery. *Id.* at 11.

The United States contends that Plaintiff's statement in her Notice of Claim regarding her diagnosis of "invasive cancer" is inaccurate, as the biopsy report merely indicated that "nests of squamous epithelium are present in stromal elements suggesting possible invasion." *Doc. 127* at 1 n.1 (referencing *Doc. 105-10*).   Even aside from the questionable accuracy of Plaintiff's statement regarding invasive cancer, the Court finds that the statement did not notify the United States of any alleged facts supporting a negligence claim, or any other legal claim, arising from Dr. Wilder's pre-surgical conduct.

Plaintiff's allegation that Dr. Wilder failed to explain her experience level to Plaintiff prior to her October 14, 2010, which is supported by the testimony of Dr. Domush, is an informed consent claim.  Circuits are split over the standard for exhausting an informed consent claim under the FTCA.  For example, while the Fifth Circuit, in *Frantz v. United States*, 29 F.3d 222 (5th Cir. 1994), held that a claim of failure to obtain informed consent is implicit when the administrative claim alleges medical negligence, the Seventh Circuit, in *Murrey v. United States*, 73 F.3d 1448, 1453 (7th Cir. 1996), held that the "administrative claim must narrate facts from which a legally trained reader would infer a failure to obtain informed consent."  *See also Bush v. United States*, 703 F.2d 491 (11th Cir. 1983) (no jurisdiction over the plaintiff's informed consent claim because neither the administrative claim nor the attached medical evaluation challenged the consent form or alleged the failure to disclose risks associated with the procedure); *Goodman v. United States*, 298 F.3d 1048, 1055 (9th Cir. 2002) (noting that the majority of circuits apply the legally-trained reader standard and hold that alleging medical negligence does not satisfy the exhaustion requirements for an informed consent claim).

The Tenth Circuit has provided limited guidance on the issue; however, it did reference the Eleventh's Circuit's *Bush* decision in a footnote and concluded that a plaintiff's informed consent issue was not properly before the court.  *See Bradley v. United States*, 951 F.2d 268, 271 n.5 (10th Cir. 1991).  This suggests that the Tenth Circuit may be inclined to join the Seventh, Ninth, and Eleventh Circuits and employ a more restrictive standard for exhaustion of informed

consent claims.   Applying this more restrictive standard, Plaintiff's Notice of Claim failed to provide facts from which a legally-trained reader would infer a failure to obtain informed consent; it likewise failed to even allude to the issue of informed consent.   Furthermore, Plaintiff has not offered any evidence suggesting that the administrative agency actually investigated the issue of informed consent.[4]   As such, the Court concludes that Plaintiff failed to exhaust an informed consent claim.

Similarly, nothing within Plaintiff's Notice of Claim references the Dr. Wilder's performance of the September 28, 2010 cold knife cone procedure, let alone suggests that it was improperly performed.   Thus, Plaintiff failed to exhaust a negligence claim as to the performance of that procedure.

Plaintiff also alleges that Dr. Wilder was negligent in failing to appreciate the seriousness of her condition and in failing to refer her to UNMH, where she could be treated by a gynecologist oncologist.   She contends that this negligent conduct by Dr. Wilder continued at the time of her TAH/BSO surgery on October 14, 2010.   There is no question that the October 14, 2010 surgery was the incident discussed in Plaintiff's Notice of Claim.   Thus, the Court concludes that any negligence claims concerning Dr. Wilder's performance of that October 14, 2010 surgery – including Dr. Wilder's failure to refer Plaintiff to UNMH for treatment by a gynecologist oncologist in lieu of performing the surgery – were exhausted by Plaintiff.

---

[4] Notably, in *Goodman v. United States*, 298 F.3d 1048 (9th Cir. 2002), the Ninth Circuit held that while not all medical malpractice claims necessarily provide notice of a claim of lack of informed consent, the agency there "expressly addressed the issue of informed consent" and was therefore "fairly on notice that the informed consent claim was before it."  *Id.* at 1057.

Accordingly, the Court will grant the United States' Motion to Dismiss to the extent that it seeks dismissal of Plaintiff's informed consent claim and her claim based upon negligence in the performance of the September 28, 2010 cold knife cone procedure.  In contrast, the Court will deny the Motion to Dismiss to the extent that it seeks dismissal of claims concerning Dr. Wilder's initiation of the October 14, 2010 surgery and her corresponding failure to refer Plaintiff to UNMH for the surgery or alternate treatment.

### ii. Negligence of GIMC

Plaintiff does not allege in her Complaint that GIMC was negligent in the medical care that it provided to her on October 22, 2010.  Instead, she limits her negligence allegations to the medical care provided "at NNMC on October 14-25, 2010."  *Id.* at ¶ 39.  Likewise, Plaintiff alleges that "[a]t all times material hereto" Plaintiff was a patient "in the care and custody of NNMC."  *Id.* at ¶ 40.

Nevertheless, in her response brief, Plaintiff maintains that her Notice of Claim adequately notified the United States of her claims based upon the negligence of GIMC and triggered an investigation into that claim.  *Doc. 105* at 15.  In that Notice, Plaintiff stated:  "On October 22, 2010, 8 days after the surgery, [Plaintiff] was experiencing severe 10/10 left flank pain and went to the Gallup Indian Medical Center (GIMC) emergency room.  She [w]as treated for a urinary tract infection with antibiotics and discharged."  *Doc. 83*, Ex. 1.  In a May 24, 2012 letter from William A. Biglow, Acting Deputy Associate General Counsel, Claims and Employment Law Branch, Mr. Biglow characterized Plaintiff's Notice of Claim as alleging that "Dr. Kathleen Wilder and other

unspecified health care providers at NNMC and the Gallup Indian Medical Center, Gallup, New Mexico, failed to diagnose and correct a cut and/or blockage of the left ureter."   *Doc. 105*, Ex. 13, at 1.   Thus, even in the view of the government agency investigating Plaintiff's administrative claim, Plaintiff was asserting that GIMC failed to diagnose and correct the cut and/or blockage of her left ureter.   However, while the Court agrees that Plaintiff may have exhausted a potential negligence claim against GIMC, it nevertheless concludes that the allegations of the Complaint fail to bring a claim based upon the negligence of GIMC.

### C.  Rule 72 Objections

On November 26, 2013, the Government filed its Motion to Strike "Rebuttal" Reports, seeking the exclusion of rebuttal reports served on Plaintiff on November 7, 2013 and authored by Plaintiff's previously-disclosed experts, Dr. Domush and Dr. Steiner.   *Doc. 94.*   In his December 19, 2013 Memorandum Opinion and Order, Magistrate Judge Garcia struck both reports, concluding that they were not proper rebuttal reports, as they were not intended solely to contradict or rebut evidence offered by the United States' experts, but were instead an effort to bolster the experts' previous opinions and to provide new opinions.   *Doc. 123* at 5-7.   Judge Garcia reasoned that Plaintiff's attempt at supplementation would circumvent the full disclosure requirement implicit in Rule 26 and would require reopening discovery and allowing additional time for the United States to supplement its own reports to rebut Plaintiff's new expert reports.   *Doc. 123* at 8.   Alternatively, Judge Garcia found the reports untimely

under Rule 26, which provides that absent a stipulation or court order, a rebuttal report must be disclosed within 30 days after the other party's disclosure. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii).  Plaintiff's rebuttal reports were served 37 days after Defendants expert reports, and Judge Garcia rejected Plaintiff's position that Chief Judge Armijo's Temporary Administrative Order staying deadlines commensurate with the shutdown's duration operated to extend the time for Plaintiff to serve rebuttal reports in this case. *Id.* at 9.

Plaintiff first challenges Judge Garcia's authority to enter the December 19, 2013 Memorandum Opinion and Order in which he struck the rebuttal reports.  He notes that this matter was transferred to Magistrate Judge Garza on December 16, 2013, three days before Judge Garcia's Order was entered. However, as Judge Garcia explained in a footnote to his Memorandum Opinion and Order, in anticipation of Judge Garcia's impending retirement the Clerk's Office mistakenly reassigned this case to Judge Garza before Judge Garcia was able to issue the rulings on the United States' Motion to Strike Rebuttal Reports. That Motion to Strike had been pending before him as referral judge, and both the presiding judge and new referral judge agreed to his issuing a ruling despite the transfer. *Doc. 123* at 1 n.1.  This Court does not agree that an oversight by Court personnel in prematurely reassigning the matter to a new referral judge divested Judge Garcia of authority to issue his ruling as to Plaintiff's expert rebuttal reports.  After all, the Court could have simply entered an Order Nunc Pro Tunc reassigning the case back to Judge Garcia, but found it unnecessary to

23

do so under the circumstances and given the explanation provided by Judge Garcia to the parties.

Next, Plaintiff insists that the subject reports were "largely if perhaps not entirely . . . pure rebuttal" and therefore constitute proper rebuttal reports under Rule 26. *Doc. 125* at 12. At the same time, Plaintiff concedes that many opinions in the report were derived from the expert's initial reports "but restated or refined to meet the contentions of the defense." *Id.* Plaintiff maintains that supplementation of the initial expert reports was necessary because neither the operating surgeons nor Plaintiff had been deposed when the experts drafted their initial reports. *See id.* at 13.

The United States persuasively outlines how many of the expert opinions in the subject reports were not responsive to the opinions of the United States' witnesses. *See Doc. 142* at 10-14. Significantly, the Federal Rules reserve the use of rebuttal reports for situations when "the evidence is intended *solely* to contradict or rebut evidence on the same subject matter identified by another party under Rule 26." Fed. R. Civ. P. 26(a)(2)(D)(ii) (emphasis added). There can be no question that the rebuttal reports of Dr. Domush and Dr. Steiner were not *solely* for the purpose of rebutting opinions advanced by the United States' experts, as the experts did not even broach many of the topics addressed by Plaintiff's experts in their so-called rebuttal reports. Even Plaintiff acknowledges that one purpose of the subject reports was to refine her experts' opinions. *See Doc. 125* at 12, 16; *see also Doc. 106* at 5 n.2. In short, Judge Garcia correctly applied Rule 26 in concluding that the subject reports were not intended solely to

24

contradict or rebut the evidence identified by the United States under Rule 26 and were therefore not proper rebuttal reports.

Plaintiff also did not advance the argument that the subject reports were proper "supplemental" reports under Rule 26(a)(2) in her response to the underlying motion to strike, maintaining instead that the reports were "rebuttal" reports. *See Doc. 108.* Under Rule 72, the Court is confined to those arguments presented to Judge Garcia. Furthermore, any incompleteness in the experts' initial reports appears to be of Plaintiff's own doing, or that of her counsel. The United States provides correspondence from Plaintiff's counsel, showing that he did not seek to take the deposition of the two operating surgeons until a week after Plaintiff served her experts' reports. *See Doc. 142*, Ex. 1. Plaintiff could have, and perhaps should have, sought to take the depositions of the operating surgeons in advance of her expert disclosure deadline in order to ensure that her expert reports contained a "complete statement of all opinions the witness[es] will express" as required by Rule 26.

Because the Court finds that Judge Garcia's ruling that the subject reports were not proper rebuttal reports under Rule 26 is neither clearly erroneous nor contrary to law, it need not reach the issue of their timeliness. The Court will overrule Plaintiff's Appeal of Magistrate's Order Striking Plaintiff's Expert Witness Rebuttal Reports

**D.  Motion in Limine**

With regard to Plaintiff's experts, the United States seeks to limit the testimony of Dr. Robert Steiner and to exclude altogether the testimony of Dr. Robert Barry Domush.

### i.   *Opinions Not Included in Expert Report*

The United States argues that new opinions offered by Plaintiff's experts at their depositions, which were not included within their initial expert reports, should be excluded.   More particularly, the United States contends that Dr. Steiner offered new opinions regarding the standard of care, separate hospitalization, and future medical costs and that Dr. Domush offered new opinions regarding Plaintiff's care at GIMC.  *Doc. 84* at 7.

According to Rule 37, when the requirements of Rule 26(a) are not met, the offending party is not allowed to use that information to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  Fed. R. Civ. P. 37(c)(1).  Rule 26(a), in turn, requires that an expert's report contain "a complete statement of all opinions the witness will express and the basis and reasons for them."  "[R]evised Rule 37(c)(1) provides an incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed."  Fed. R. Civ. P. 26, advisory committee's note.  Thus, unless the omission of certain opinions by Plaintiff's experts from their initial reports was substantially justified or harmless, Rule 37 requires their exclusion.

First, with respect to Dr. Domush's allegedly "new" opinion concerning the negligence of GIMC, the Court finds that Dr. Domush's report specifically refers to the negligence of the staff at GIMC when it provided as follows:

> [i]n my professional opinion, the [GIMC] was also negligent in not identifying the occluded ureter earlier, when Ms. Franklin went to that facility. It was concluded that Ms. Franklin had only a urinary tract infection but she was post-operative by only a few days, and the staff at the Gallup Indian Medical Center did not do a proper work-up. They certainly should have included a surgical complication in their differential diagnosis, which they failed to do.

*Doc. 106*, Ex. 1 at 3.

Nevertheless, although Dr. Domush's opinion as to negligence by GIMC is not excludable for the reasons articulated by the United States in its Motion in Limine, the failure of Plaintiff to bring a negligence claim in her Complaint based upon the conduct of GIMC renders Dr. Domush's opinion irrelevant. *See supra* Part III.A.ii.

As to the other "new opinions" referred to by the United States, the Court agrees that they are absent from the experts' initial reports. The United States relies upon *Coleman v. BNSF Railway Co.*, 06cv1076, 2008 WL 5622542 (D.N.M. Aug. 29, 2008) (J. Garcia) to argue that the Court should exclude the experts' "belatedly" disclosed opinions. *Doc. 84* at 8-9. In *Coleman*, the defendant argued that an opinion given by the plaintiff's expert at his deposition had not been disclosed in the expert's reports, which were served upon the plaintiff before the deposition. *Id.* at *1-2. Judge Garcia concluded that the expert's new opinion was impermissible because, contrary to the requirements of Rule 26, the expert's earlier reports did not contain a complete statement of all

the opinions to be expressed and the opinion was offered "too late in the process to allow opposing parties to adequately prepare for cross-examination, or even to secure the services of their own expert to rebut the new opinion."  *Id.* at *4.

In this case, the bench trial previously scheduled for February 3, 2014, has been vacated and reset for June 10, 2014, just under four months from now. Furthermore, the United States became aware of these "new opinions" at the experts' September depositions, and the deposition transcripts suggest that counsel for the United States was able to thoroughly explore the opinions with the experts at that time.

Furthermore, the Court's survey of case law beyond this district suggests that courts are divided as to whether disclosure of expert opinions in a deposition can be an adequate substitute for their inclusion in an expert report.  In *Smith v. Tenet Healthsystems SL, Inc.*, 436 F.3d 879 (8th Cir. 2006), the Eighth Circuit concluded that even though the expert there did not mention reliance on X-rays in his expert report, he could nevertheless rely upon them at trial, because they were disclosed during his deposition.  *Id.* at 889.  The court reasoned that the violation of Rule 26 was harmless, where the expert's deposition put the opposing party on notice as to the expert's reliance on the X-rays.  *Id.*  Also, in *Iacangelo v. Georgetown University*, 272 F.R.D. 233 (D.D.C. 2011), the court noted that while "technically" all expert disclosures must be set forth in an expert's written report, "[i]n practice . . . a party is considered to have met its obligations for expert disclosure so long as all required information is divulged in either the written report or a subsequent deposition of the expert."  *Id.* at 235.

Finally, in *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 192 F.R.D. 511 (D. Md. 2000), the court decided not to exclude testimony of the plaintiff's expert, where, during his deposition, he made changes to an opinion that he had set forth in his expert report. *Id.* at 514. Although the court noted that the changes would "offer fertile ground for cross-examination at trial," it was not persuaded to exclude the revised opinions. *Id.* It reasoned that the changes to the expert opinion were "both technically timely, and sufficiently in advance of trial that [they could not] fairly be characterized as ambush tactics." *Id.*

Additionally, a Tenth Circuit decision suggests that this circuit may, under certain circumstances, be inclined to afford some degree of flexibility to experts who omit opinions or bases from their reports, at least when there is an absence of surprise to opposing counsel. In *Nalder v. West Park Hospital*, 254 F.3d 1168 (10th Cir. 2001), the Tenth Circuit applied the *Smith* factors[5] and concluded that the plaintiffs failed to demonstrate significant surprise or prejudice when the trial court allowed an expert to give opinions at trial that were not included in her expert report. *Id.* at 1178. The court noted that the defendants had repeatedly informed the plaintiffs that the expert's testimony would include criticisms of the plaintiffs' expert's testimony and that the expert's deposition testimony explained the source of her disagreement with the plaintiff's expert. *Id.* at 1178. While the Tenth Circuit conceded that the expert could have done a better job of providing the basis for her opinion in her expert report, it nevertheless concluded that the

---

[5] The *Smith* factors, which aid the court in determining whether a court has abused its discretion in excluding testimony, are: 1) the prejudice or surprise in fact of the party . . . ; 2) the ability of that party to cure the prejudice; 3) the extent to which [the Rule violation] would disrupt the orderly and efficient trial of the case . . . ; and 4) bad faith or willfulness in failing to comply with the [Rule]." *Smith v. Ford Motor Company*, 626 F.2d 784, 797 (10th Cir. 1980).

"central theme" of the expert's testimony was consistent at her deposition and during trial. *Id.* at 1178-79. The court found no abuse of discretion in the lower court's refusal to exclude the testimony. *Id.*

Here, Dr. Steiner's opinion that Dr. Wilder breached the standard of care in failing to act upon a post-surgery increase in Plaintiff's creatinine level is not reflected in his expert report and was elicited for the first time at his deposition. Because the United States has not established unfair surprise in the offering of this opinion during Dr. Steiner's September deposition, however, the Court considers this technical violation of Rule 26 to be harmless. Moreover, the same rationale applies to opinions elicited from Dr. Domush for the first time at his September deposition.[6]

### ii. Dr. Steiner's Testimony Regarding Standard of Care

The United States argues that Dr. Steiner, by his own admission, is only qualified to testify regarding the standard of care of a nephrologist, not a gynecologist, and that the standard of care opinions that he offers in this case should therefore be excluded. *Doc. 84* at 11. Plaintiff assures the Court that Dr. Steiner will not be asked to testify about "the narrow sub-specialty of gynecology." *Doc. 106* at 3. Instead, Plaintiff indicates that his "primary role" in this case is as an expert on causation, opining that Plaintiff's ureteral obstruction ultimately led to her loss of a kidney. *Id.* The Court will hold Plaintiff to this

---

[6] In reconciling the Court's decision to strike Plaintiff's expert rebuttal reports and its decision to allow expert opinions that were omitted from initial expert reports, the timing is significant. Dr. Domush and Dr. Steiner's initial reports were served on the United States on August 1, 2014. *Doc. 84* at 2. Thereafter, Dr. Domush and Dr. Steiner were deposed on September 10, 2013, and September 13, 2013, respectively, well before the discovery deadline. *Id.* at 2. The physician's rebuttal reports, on the other hand, were not served until nearly two months later, on November 5, 2013, after the discovery deadline.

assurance and will limit Dr. Steiner's testimony to those opinions over which he is qualified to testify.

As to Dr. Steiner's testimony regarding future damages, the United States asserts that the testimony is too speculative and should be stricken "[s]ince Dr. Steiner cannot say with a reasonable degree of medical probability that Plaintiff will incur additional medical expenses due to the purported negligence of the Government." *Doc. 130* at 5.  Having reviewed Dr. Steiner's deposition testimony, the Court agrees that the need for future dialysis treatments is not expressed to a reasonable degree of medical probability, and, as such, will be excluded.

### iii.  Reliability of Dr. Domush's Opinions

Under Rule 702, the Court must determine whether Dr. Domush's opinions are reliable and helpful under the principles set forth in *Daubert*.  *See 103 Investors I, L.P.*, 470 F.3d at 990.  The United States maintains that Dr. Domush's opinions are unreliable, arguing that he "does not state in his report that any of [the] 'points' [in his expert report] were violations of the standard of care." *Doc. 84* at 3.  Yet, just preceding Dr. Domush's numbered "points," he states:  "All of the opinions expressed herein are stated to a reasonable degree of medical probability.  It is my professional opinion that there were several violations of the standard of care in the treatment of Ms. Franklin, as set forth below." *Doc. 106*, Ex. 1, at 2 (emphasis added).  Also, contrary to the Untied State's position, Dr. Domush's testimony does not consist of mere "personal opinions . . . not based upon any widely accepted standard recognized by the

medical profession."  While Dr. Domush' deposition testimony is not always

perfectly precise, the Court finds the United States' criticism of his opinions

somewhat overstated and more appropriately addressed on cross-examination.[7]

Likewise, Dr. Domush's imperfect explanation of the standard of care does

not persuade the Court to exclude Dr. Domush as a witness at trial.  Dr. Domush

describes the standard of care as follows:  "Common practice, what good

physicians do, what better-than-good physicians do, and what's expected of the

common folk."  *Doc. 83*, Ex. C, at 18.  The New Mexico Court of Appeals

describes the standard of care as a standard that requires physicians "to possess

and apply the knowledge and to use the skill and care that was ordinarily used by

reasonably well qualified doctors of the same field of medicine as that of the

defendant practicing under similar circumstances, giving due consideration to the

locality involved."  *Greigo v. Grieco*, 561 P.2d 36, 41 (N.M. Ct. App. 1977).

Although the United States takes issue with Dr. Domush's inclusion of "what's

expected of the common folk" in his rendition of the standard of care, Dr.

Domush's deposition testimony suggests that he did not rely upon this "common

folk" factor when providing the opinions in his report.  *See Doc. 83*, Ex. C at

35:18-25 ("When I wrote the report, I was looking at the case from what Dr.

Wilder did and/or didn't do.  Okay?  And later on, it came to me on an airplane . .

. I began to think about what duties do we have as physicians that we are

expected – that patients expect of us or that they should expect of us or that we

---

[7] For instance, it is the Government's position that some of Dr. Domush's "points" are merely
"statements of fact" and that Dr. Domush therefore "did not intend to convey that each 'point,' was
a breach of the standard of care."  A fair reading of Dr. Domush's report, even in light of his
deposition testimony, does not support the position that Dr. Domush's "points" are not opinions as
to how Dr. Wilder breached the standard of care.

should demand of ourselves because maybe different oaths we've taken say that we have to have these duties.")  Accordingly, at least with respect to the opinions offered in his expert report, Dr. Domush did not rely upon the "common folk" factor.  As to any opinions elicited for the first time during Dr. Domush's deposition, the Court is confident that the United States will be able to use cross-examination to alleviate its concerns.

Notably, although the Court must apply *Daubert* standards even in a matter tried to the bench, "the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise."  *Attorney General of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009).  Indeed, "a judge conducting a bench trial maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation."  *Id.* at 780.  Bearing in mind the diminished concern over the admission of potentially unreliable expert testimony, the Court concludes that Dr. Domush's explanation and understanding of the standard of care and his application of the standard to the facts of this case are not so off-base as to warrant exclusion at this time.

The United States faults Dr. Domush for not citing medical literature and for not subjecting his opinions to peer review.  Dr. Domush testified in his deposition that his opinions were based on forty years of practicing and teaching gynecological medicine.  The Tenth Circuit has explained, with regard to the *Daubert* factors, that "[r]egardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the

courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Hoffman v. Ford Motor Co.*, 493 Fed. Appx. 962, 974-75 (10th Cir. 2012).  Though Dr. Domush relies strictly upon his personal experience in practicing and teaching gynecology to offer opinions in this case, the Court does not consider this an adequate basis to exclude his opinions.

Not all of the opinions offered by Dr. Domush will be allowed, however. For instance, Dr. Domush opines that Dr. Wilder violated the standard of care by not explaining her experience level in similar procedures to Plaintiff.  *Doc. 106*, Ex. 1, at 2.  While this opinions is consistent with the testimony that Dr. Domush offered at his deposition, as discussed above Plaintiff did not exhaust an informed consent claim, rendering the informed consent opinion by Dr. Domush unhelpful and irrelevant.  In contrast, Plaintiff's Notice of Claim was adequate to exhaust Plaintiff's claims concerning Dr. Wilder's performance of the October 14, 2010 surgery, including her claim that Dr. Wilder was negligent in initiating the procedure in lieu of referring Plaintiff to UNMH.  The Court will allow this opinion by Dr. Domush in support of Plaintiff's claims.

### iv. Inadequate Report

Finally, the United States contends that because Dr. Domush's Rule 26 disclosure omitted at least one case in which he testified, his expert report was insufficient.  *Doc. 84* at 13 (citing *Jennings v. Thompson*, 792 F. Supp. 2d 1 (D.D. C. 2011).  Plaintiff counters, maintaining that there was no harm to the United States, as it discovered the oversight through its own research and discussed the

case with Dr. Domush at his deposition.  The Court agrees and finds the Rule 26 violation to be harmless.

## IV.  CONCLUSION

**Wherefore,**

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Sanctions (*Doc. 90*) is denied.

**IT IS FURTHER ORDERED** that the United States' Motion to Dismiss (*Doc. 83*) is granted to the extent that it seeks dismissal of Plaintiff's informed consent claim and her claim based upon negligence in the performance of the September 28, 2010 cold knife cone procedure and denied in all other respects.

**IT IS FURTHER ORDERED** that Plaintiff's Appeal of Magistrate's Order Striking Plaintiff's Expert Witness Rebuttal Reports (*Doc. 125*) is overruled.

**IT IS FURTHER ORDERED** that the United States' Motion in Limine (*Doc. 84*) is granted to the extent that it seeks to limit Dr. Steiner's testimony to the area of urology and to the extent that it seeks the exclusion of his opinion as to the need for future dialysis treatments and is denied in all other respects.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE