## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

BETTY FRANKLIN,

      Plaintiff,

v.                                                       CIV 12-1167 KBM

UNITED STATES OF AMERICA,

      Defendant.

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

**THIS MATTER** comes before the Court on the following:  (1) a bench trial held from June 10, 2014 through June 13, 2014; (2) Plaintiffs Proposed Findings of Fact and Conclusions of Law, filed May 27, 2014 (*Doc. 173*); (3) Plaintiff's First Amended Requested Findings of Fact and Conclusions of Law, filed June 4, 2014 (*Doc. 188*); (4) Defendant's Proposed Findings of Fact and Conclusions of Law, filed May 27, 2014 (*Doc. 175*); (5) Defendant's Proposed Amended Findings of Fact and Conclusions of Law, filed June 1, 2014 (*Doc. 178*); (6) Defendant's Motion for Judgment on Partial Findings, filed June 13, 2014 (*Doc. 195*); (7) Defendant's Supplemental Proposed Findings of Fact and Conclusions of Law, filed July 15, 2014 (*Doc. 201*); and (8) Plaintiff's Motion to Strike Unauthorized Supplemental Findings of Fact and Conclusions of Law, filed July 16, 2014 (*Doc. 202*).

The Court denied Defendant's Motion for Judgment on Partial Findings, declining to render judgment prior to the close of evidence pursuant to Fed. R.

Civ. P. 52(c).  Herein, the Court denies Plaintiff's Motion to Strike Unauthorized

Supplemental Findings of Fact and Conclusions of Law.  Defendant's

supplement, which is neither a motion nor a pleading, was intended merely to

assist the Court in the preparation of its Findings of Fact and Conclusions of Law

by providing citations to the record.  This supplemental filing did not prejudice

Plaintiff, who Defendant invited to file her own unopposed supplement with

citations to the record, which Plaintiff apparently declined.

The Court having considered the pleadings, trial testimony, exhibits, and

relevant law, finds that Plaintiff did not establish any of her negligence claims by

a preponderance of the evidence.  The Court concludes herein that Defendant,

through Dr. Kathleen Wilder, did not breach its duty of care to Plaintiff Betty

Franklin in the performance of her hysterectomy on October 14, 2010 or her

post-surgical care.  Consequently, the Court will enter final judgment for

Defendant and against Plaintiff on all of her claims.

## I.  BACKGROUND

Plaintiff Betty Franklin, a member of the Navajo Nation, alleges that she

received negligent medical treatment under the care of Dr. Kathleen Wilder at

Northern Navajo Medical Center ("NNMC"), which she asserts ultimately resulted

in the loss of her left kidney.  Plaintiff brought suit against the United States

based for the purported negligence of Dr. Wilder pursuant to the Federal Tort

Claims Act, 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671 *et seq.*

On August 19, 2010, Plaintiff, a post-menopausal woman, underwent a

well-woman examination at NNMC after reporting vaginal bleeding for

approximately two months.  Dr. Wilder, an employee of Indian Health Services ("IHS") performed various procedures on Plaintiff in August and September of 2010, and she was diagnosed with "squamous epithelium most consistent with squamous cell carcinoma in situ."  Dr. Wilder recommended that Plaintiff undergo a total abdominal hysterecomy and bilateral salpingo-oophorectomy, which was performed on October 14, 2010.

At a follow-up appointment on October 25, 2010, Dr. Wilder informed Plaintiff that the pathology reports from her hysterectomy indicated that she had invasive cervical cancer.  Plaintiff reported to Dr. Wilder that she had experienced left lower back pain for approximately one week.  A CT scan of Plaintiff's abdomen that same day showed "moderate left hydronephrosis and hydroureter with associated perinephric stranding and enlargement of the left kidney."  Concerned that Plaintiff had sustained a ureteral obstruction during her hysterectomy, Dr. Wilder referred Plaintiff to the University of New Mexico Hospital ("UNMH").  Plaintiff was admitted to UNMH the next day for evaluation and treatment of her hydronephrosis as well as for consultation with the gynecology oncologists concerning treatment for her cancer.  On October 29, 2010, UNMH confirmed that Plaintiff had suffered a ligated left ureter during the hysterectomy performed by Dr. Wilder on October 14, 2010.  A nephrostomy tube was placed to relieve the ureteral obstruction, and Plaintiff underwent radiation and chemotherapy to treat her cervical cancer.  Plaintiff's left kidney was ultimately removed on July 20, 2011.

On November 5, 2013, Defendant filed its Motion for Summary Judgment on Plaintiff's negligence claims. *Doc. 85*. Deciding this motion required the Court to parse Plaintiff's negligence claims, with certain claims surviving and others being dismissed in advance of trial. *See Doc. 104*. Before trial, the Court outlined for the parties the remaining negligence claims to be tried, which included the following conduct by Dr. Wilder: (1) undertaking the October 14, 2010 hysterectomy; (2) failing to refer Plaintiff to UNMH; (3) failing to obtain a cystoscopy or to perform a staging procedure; (4) failing to stop the hysterectomy upon discovering possible signs of cancer; (5) failing to recognize inter-operatively the stitch in Plaintiff's bladder; and (6) failing to heed Plaintiff's post-hysterectomy increase in creatinine.[1] Notably, Plaintiff did not present evidence at trial as to Dr. Wilder's failure to perform a staging procedure. As such, this claim fails.

At trial, objections were made as to the scope of expert testimony because, as counsel argued, certain opinions had not been previously disclosed in the experts' reports. The Court has reviewed and considered the reports of testifying experts submitted by the parties as exhibits at trial and has disregarded expert opinions and testimony that fall outside the scope of these reports or the expert's areas of recognized expertise.

## II. FINDINGS OF FACT

1.      Plaintiff is Navajo and lives in Lukachukai, Arizona.

---

[1] Defendant did not move for summary judgment on Plaintiff's claim that Dr. Wilder was negligent in failing to heed Plaintiff's post-hysterectomy increase in creatinine. *See Doc. 85.*

2.      Defendant United States of America operates the Indian Health Service
        ("IHS"), a government agency.

3.      Plaintiff received medical treatment at various IHS medical facilities,
        including the Tsaile Clinic, the Chinle Health Care Facility ("Chinle
        Facility"), Northern Navajo Medical Center ("NNMC"), and Gallup Indian
        Medical Center ("GIMC").

4.      On September 22, 2008, Plaintiff presented to the Tsaile Clinic for her
        annual exam and pap smear.  Plaintiff's pap test revealed "Epithelial cell
        Abnormality.  Low-grade squamous intraepithelial lesion, mild dysplasia.
        Rare cells suspicious for high-grade lesion are also present."

5.      A letter was sent to Plaintiff, advising her of the abnormal pap results and
        indicating that she needed a colposcopy.  Plaintiff, however, missed four
        appointments scheduled by IHS to address her abnormal pap test results
        and to perform a colposcopy.

6.      On February 4, 2009, Dr. Adrienne Moore sent a note to Dr. Manning at
        the Tsaile Clinic, indicating that she was "worried about [Plaintiff].  Pap
        suspicious for HiSIL 9/22/2008.  Missed colpo x 4.  If she doesn't get to
        Chinle, wd you arrange for her to have a pap & HPV testing in Tsaile?"

7.      Plaintiff testified that she missed appointments at Tsaille Clinic and Chinle
        Facility because she did not have transportation and because the roads
        were impassible.  During this same timeframe, however, she presented to
        Tsaile Clinic for a flu shot, to get diabetes medication, and because of

neck, back, shoulder, and leg pain.  She was also seen at NNMC for dysuria.

8.    A Public Health Nurse went to Plaintiff's home on at least three occasions to encourage Plaintiff to attend her follow-up gynecological appointments. The nurse was unable to make contact with Plaintiff but left sealed correspondence in an envelope at Plaintiff's door and spoke to her brother on one occasion.

9.    The Public Health Nurse made transportation arrangements for Plaintiff to attend a March 12, 2009 gynecologic appointment.  Plaintiff appeared at this appointment and underwent a pap test and colposcopy.  The pathology report indicated that Plaintiff had moderate dysplasia with HPV on two samples and "fragments of negative endocervix with fragments of squamous epithelium with high grade cervical intraepithelial neoplasia" on the third sample.

10.   Plaintiff failed to appear at the Tsaile Clinic for a follow-up gynecological appointment on March 27, 2009.  She had, however, presented at the Tsaile Clinic five days earlier for a diabetes check-up.

11.   After Plaintiff missed her March 27, 2009 appointment, Dr. Moore sent a referral notice to the Public Health Nurse, indicating that Plaintiff needed "recall" and required a LEEP procedure in the operating room.  She asked the nurse to "Please counsel & encourage pt to follow-up.  Cervical CA is PREVENTABLE."

12.  The Public Health Nurse went to Plaintiff's home on March 31, 2009, to encourage her to appear at a follow-up appointment.  Plaintiff was "not wanting to wait for further teaching," as she was "feeding livestock."

13.  The Public Health Nurse arranged for transportation for Plaintiff for an April 17, 2014 follow-up appointment.  Plaintiff appeared at this appointment and consented to a LEEP procedure.  Dr. Moore performed the LEEP procedure on May 6, 2009, and the pathology report indicated "cervix with islands of squamous epithelium showing moderate to severe dysplasia . . . Margins indeterminate."

14.  At a follow-up appointment after the LEEP procedure, Plaintiff was informed of the results and told to follow-up in November 2009.

15.  Plaintiff did not follow-up with any gynecology appointments for over a year.  She did, however, present for at least 14 different appointments at Tsaile Clinic, Chinle Facility, and NNMC during this time period.

16.  Plaintiff presented to the Tsaile Clinic on July 30, 2010, complaining of vaginal bleeding for two months.  Plaintiff underwent a gynecological exam, including a pap smear, and was scheduled for a pelvic ultrasound at Chinle Facility four days later.  An appointment was also scheduled for Plaintiff with Dr. Moore at the Tsaile Clinic for August 9, 2010.

17.  The results of Plaintiff's July 30, 2010 pap smear showed "epithelial cell abnormality, atypical glandular cells of undetermined significance."

18.  On August 9, 2010, Dr. Moore obtained another pap and an endometrial biopsy.  The pap was negative for intraepithelial lesion and malignancy;

however, the biopsy showed "fragments of squamous epithelium with

severe dysplasia."  The pathology report noted that there was "little stroma

to evaluate for invasion."

19.     Plaintiff declined a follow-up appointment at the Chinle Facility.

20.     On August 16, 2010, Plaintiff presented to NNMC complaining of bleeding

for the prior two months.  Plaintiff was referred to the OB/GYN Clinic at

NNMC.

21.     Plaintiff was seen by Dr. Wilder three days later on August 19, 2010.

Plaintiff reported to Dr. Wilder that she remembered being told that she

"had cancer" but that it was "many years ago."  Plaintiff indicated that she

had a procedure, which Dr. Wilder identified as a "D&C," and "was fine."

Plaintiff did not remember where or when she was treated for cancer.

Plaintiff also reported that she had not previously had abnormal paps or

STDs.

22.     Dr. Wilder did not have Plaintiff's medical records from Tsaile Clinic or

Chinle Facility.

23.     Upon physical examination at her August 19, 2010 appointment, Dr.

Wilder found remodeling of the cervix and vagina and a mass in the cul-

de-sac of the rectum, which she speculated might be from a retroverted

uterus.  She also performed a pap smear and endometrial biopsy and

scheduled an ultrasound.

24.     The biopsy pathology results noted "scant fragments of high grade

squamous dysplasia . . . moderate to severe dysplasia."  The pap results

indicated "epithelial cell abnormality.  Atypical squamous cells, cannot
exclude high-grade squamous intraepithelial lesion."

25.   The radiologist's report from Plaintiff's ultrasound indicated that Plaintiff's
"endometrium is thickened, irregular, and hyperechoic."  His impression
was that the ultrasound showed "[a]bnormal thicken [sic] and irregular
endometrium worrisome for endometrial carcinoma."

26.   Dr. Wilder scheduled a diagnostic hysteroscopy, a fractional dilation and
curettage, and a LEEP for September 28, 2010.

27.   On September 28, 2010, Dr. Wilder performed a fractional dilation and
curettage and a cold knife cone of the anterior cervix but failed to perform
a diagnostic hysteroscopy, because the scope would not pass into the
endometrial cavity.

28.   Dr. Wilder's operation report indicated that Plaintiff's uterus was "slightly
enlarged" and "very firm."  The report also indicated that a full cold knife
cone of the cervix was impossible, as there was "no distinct cervix with an
anterior and posterior lip."  Dr. Wilder amputated the anterior portion of
what she thought may have been the cervix for biopsy.

29.   Plaintiff's tissue samples were sent to San Juan Regional Medical Center
for analysis.  The pathology results from the September 28, 2010
procedure indicated that two of the samples showed "discontinuous
fragments of dysplastic squamous epithelium most consistent with
squamous cell carcinoma in situ."  Another sample showed "at least
severely dysplastic squamous epithelium," and the anterior cervix showed

"at least squamous cell carcinoma in situ."  The diagnosis as to the anterior cervix also referenced a "comment," which read, "Though, in my opinion, definite invasion is not seen, nests of squamous epithelium are present in stromal elements suggesting possible invasion."

30.    On October 8, 2010, Dr. Wilder called Dr. Teresa Rutledge, a gynecologist oncologist at UNMH.  Dr. Wilder told Dr. Rutledge about the pathology results, including the comment indicating "possible invasion."  Dr. Wilder did not forward any medical records or tissue slides to Dr. Rutledge for her review, and Dr. Rutledge did not request them.

31.    Dr. Rutledge advised Dr. Wilder that it was reasonable for Dr. Wilder to perform a hysterectomy at NNMC, and she indicated that UNMH would perform the same operation if Plaintiff sought treatment at UNMH.  Dr. Rutledge also told Dr. Wilder that if she found "obvious cancer" in Plaintiff's parametrium or elsewhere upon opening her for surgery, Plaintiff would need radiation and not a hysterectomy.

32.    Dr. Wilder met with Plaintiff, informed her of the pathology results, and discussed with her the options of having a hysterectomy at UNMH or at NNMC.  Plaintiff chose to proceed with the hysterectomy at NNMC[2] and asked Dr. Wilder to also remove her tubes and ovaries.

33.    Plaintiff was not diagnosed with invasive cancer prior to her October 14, 2010 hysterectomy.

---

[2] Although Plaintiff testified that she was not given the option to go to UNMH for surgery, the Court finds the concurrent medical records and the testimony of Dr. Wilder more credible than Plaintiff's testimony on this point.

34.   On October 14, 2010, Dr. Wilder and her surgical assistant, Dr. Jennifer
      Kang, performed a total abdominal hysterectomy with bilateral salpingo-
      oophorectomy on Plaintiff.

35.   They did not find obvious signs of invasive cancer during the course of the
      operation; therefore, they completed the hysterectomy.

36.   During the operation, Dr. Wilder identified Plaintiff's ureters to ensure that
      they were away from the surgical field.  She successfully removed
      Plaintiff's cervix, uterus, tubes, and ovaries.  She placed sutures as
      needed and checked the bladder by dissecting as far down as she could.
      Upon physical inspection, Dr. Wilder concluded that no sutures had been
      placed through the bladder.

37.   The placement of a stitch in the bladder during a hysterectomy is a known
      complication or maloccurrence and is not a breach of the standard of care.
      The average risk of damage to the urinary system during a hysterectomy
      is approximately 1%.

38.   Approximately 50% to 80% of ureteral damages goes undiagnosed
      intraoperatively during hysterectomies.

39.   A procedure called a cystoscopy can be used to reveal stitches in ureters
      and bladders.

40.   Dr. Wilder had privileges to do cystoscopies at NNMC.

41.   It is not the standard of care to perform a cystoscopy when the surgeon
      does not suspect injury, as the procedure carries a risk of morbidity.

42.     Both Dr. Wilder and Dr. Kang felt that Plaintiff's hysterectomy went well
        and was without complications.  As a result, neither surgeon suspected
        damage to Plaintiff's ureter or considered a cystoscopy necessary.[3]

43.     In her operation report, Dr. Wilder described her findings as follows:
        "[s]mall postmenopausal uterus, tubes, and ovaries.  The cervix was noted
        to be very enlarged and very firm.  No obvious parametrial involvement.
        There was some thickening of the cardinal ligaments next to the cervix.
        However, it was relatively soft thickening, not hard like the cervix."

44.     After surgery, Plaintiff complained of gas and incisional and abdominal
        pain, but did not complain of flank pain, which would be indicative of
        possible ureteral injury.[4]

45.     Plaintiff's temperature was elevated on post-operative day one and two,
        with her highest temperature reaching 100.2 degrees.  Her temperature,
        however, never technically reached a fever, or 100.4 degrees.  Plaintiff's
        other vital signs were normal.

---

[3] In making this finding the Court rejects Dr. Robert Domush's opinion that Dr. Wilder's
statement in her post-operative note that "no sutures were actually placed through the
bladder" somehow suggests that she actually was concerned that she had injured
Plaintiff's bladder.  The Court finds Dr. Wilder's testimony that she was not concerned
that she had placed any stitches in the bladder credible and consistent with the written
post-operative note.

[4] Plaintiff and her daughter testified at trial that Plaintiff experienced intense pain,
including flank pain, just after her operation.  The Court, however, does not find this
testimony, which contradicts the relevant medical records and the testimony of Dr.
Wilder, credible.

46.    By post-operative day three, Plaintiff's temperature had returned to normal, and she reported that she "felt so much better" after passing flatus and having a bowel movement.

47.    Dr. Wilder ordered a post-operative CBC, which included a creatinine test and a "clean catch urine."

48.    On post-operative day three, Plaintiff's creatinine level had risen to 1.43 from a pre-operative measurement of .92. The other creatinine levels for Plaintiff that Dr. Wilder had available were 1.0 and 1.1 in 2008. The normal range for creatinine is approximately .5 to 1.5, depending on the laboratory.

49.    The utility of using serial creatinine levels to detect ureteral injury from a hysterectomy is limited, as there are other causes for elevated creatinine levels after surgery, including intraoperative blood pressure drops, operative and peri-operative medications, shifts in intravascular fluid volume, and dehydration. The most common cause for acute creatinine elevation is dehydration.

50.    Because Plaintiff's creatinine had risen to 1.43, Dr. Wilder instructed her not to resume taking the medication Metformin.

51.    Plaintiff was discharged on post-operative day three.

52.    Plaintiff returned to NNMC on October 19, 2010, five days after her surgery, to have her stitches removed and to have her creatinine level rechecked. Her creatinine had dropped to 1.27, and Dr. Wilder, therefore, instructed her to resume taking Metformin in three days. Plaintiff had no

complaints of inadequate oral intake or inadequate urinary or bowel function.

53.   Dr. Wilder received the biopsy results from Plaintiff's hysterectomy on October 21, 2010.  The results showed "widely invasive moderately differentiated squamous cell carcinoma" in Plaintiff's cervix.  A tumor measuring 6.0 x 4.5 x 4.0 centimeters was found with narrowly clear margins.

54.   On October 22, 2010, a nurse notified Plaintiff that Dr. Wilder "need[ed] to see her ASAP," and an appointment was scheduled for October 25, 2010.  Dr. Wilder also scheduled an appointment for Plaintiff with a gynecologic oncologist at UNMH for November 4, 2010, in anticipation of referring Plaintiff.

55.   Plaintiff appeared at her October 25, 2010 appointment, complaining of lower back pain for the past three to five days.  Her creatinine was measured at 1.41.

56.   Dr. Wilder became "concerned about . . . etiology such as obstruction related to surgery," and ordered a CT scan, which showed hydroureter and hydronephrosis, and she referred Plaintiff to UNMH that day.

57.   Because UNMH did not have any available beds on October 25, 2010, Plaintiff was given the option of going to the emergency room to wait for a bed to open or driving herself to UNMH gynecology oncology clinic to be admitted directly the next day.  Plaintiff opted to go directly to the gynecology oncology clinic the following day.

58.   Plaintiff was discharged home from NNMC with pain medication, medical records, and a written summary of her course of care by Dr. Wilder.

59.   Plaintiff was admitted to UNMH on October 26, 2010, where she reported, erroneously, that she had never had an abnormal pap.  She also reported having done "relatively well" after surgery until October 22, 2014, when she began to experience some severe flank pain.

60.   On October 29, 2010, UNMH confirmed that Plaintiff had a ligated left ureter.  Her kidney, however, was functioning.

61.   The medical team at UNMH, including an urologist and Dr. Rutledge, decided that Plaintiff required radiation and chemotherapy before performing a ureteral re-implant.

62.   In order to relieve the ureteral obstruction, UNMH placed a nephrostomy tube on October 29, 2010.

63.   Had Dr. Wilder diagnosed Plaintiff's ureteral obstruction on October 17, 2010, rather than on October 25, 2010, it would not have changed the course of treatment for the obstruction, and a nephrostomy tube would have still been placed.

64.   On November 22, 2010, Plaintiff began concurrent chemotherapy and radiation treatment on a weekly basis, which continued for approximately two and a half months.

65.   Plaintiff's kidney function was essentially normal before she underwent cancer treatment.

66.     During the time that Plaintiff had a nephrostomy tube, her kidney became

        infected and damaged.  She was hospitalized on November 29, 2010 to

        December 10, 2010 for sepsis.

67.     Ultimately, Plaintiff's radiation treatment made it difficult to perform a re-

        implantation of her ureter, and she elected to have her kidney removed

        through a nephrectomy

68.     Plaintiff's kidney was removed on July 20, 2011.

### III.      CONCLUSIONS OF LAW

1.      The United States is the proper defendant in this case pursuant to 28

        U.S.C. § 2679(a) and (b).

2.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1346, which

        vests the Court with exclusive jurisdiction of claims against the United

        States for the negligent acts and omissions of its employees, including

        employees of the IHS and NNMC.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1402(b).

4.      All administrative prerequisites set forth under 28 U.S.C. § 2675 have

        been met with respect to the claims now before the Court.

5.      Defendant is vicariously liable for any negligence of agents and

        employees of NNMC and the IHS, including Dr. Wilder at the time she was

        employed by NNMC.

6.      Plaintiff failed to exercise ordinary care for her own health and safety by

        failing to keep scheduled gynecological appointments, failing to request

follow-up appointments, and failing to give an accurate medical history to Dr. Wilder and UNMH.

7.    Plaintiff's negligence delayed the diagnosis and treatment of her cervical cancer and contributed to the severity of her medical situation.

8.    Dr. Wilder, possessed and applied the knowledge and used the skill and care ordinarily used by reasonably well-qualified specialists practicing under similar circumstances, giving due consideration to the locality involved.

9.    More particularly, the following conduct by Dr. Wilder fell within the standard of care:

a.   proceeding with a hysterectomy in lieu of referring Plaintiff to UNMH, given that Plaintiff had not been diagnosed with invasive cancer;

b.   continuing Plaintiff's hysterectomy even upon finding an enlarged and very firm cervix and thickening of the cardinal ligaments next to the cervix during Plaintiff's October 14, 2010 hysterectomy;

c.   deciding not to perform a cystoscopy on Plaintiff immediately following the hysterectomy, where she did not perceive any complications or suspect injury to Plaintiff's ureters or bladder;

d.   ordering a creatinine test on Plaintiff two days after surgery;

e.   failing to diagnose ureteral damage or obstruction based upon Plaintiff's post-operative spike in creatinine; and

      f.   not discovering a possible ureteral obstruction prior to October 25, 2010.

10.    The injury to Plaintiff's ureter was an accepted risk of surgery and was not caused by the negligence of Dr. Wilder.

11.    The loss of Plaintiff's kidney was not caused by any failure of Dr. Wilder to heed an increase in Plaintiff's creatinine level on October 17, 2010.

12.    Because Plaintiff cannot establish by a preponderance of the evidence the elements of a cause of action for negligence, the United States is not liable for Plaintiff's damages and judgment should be entered in favor of the United States.

      **IT IS HEREBY ORDERED** that final judgment will be entered in accordance with these findings and conclusions.

Dated this 9th day of December, 2014.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE
Presiding by Consent